UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Reach Companies, LLC,                                      File No. 20-cv-1129 (ECT/JFD)

             Plaintiff,

v.                                                          **OPINION AND ORDER**

Newsert LLC and David Serata,

             Defendants.

Aaron David Sampsel, Carl E. Christensen, and Scott A. Jurchisin, Christensen Law Office
PLLC, Minneapolis, MN, for Plaintiff Reach Companies, LLC.

Aaron P. Knoll and Mark L. Johnson, Greene Espel PLLP, Minneapolis, MN, for
Defendants Newsert LLC and David Serata.

        This diversity case arises out of two business organizations' efforts to enter the

hand-sanitizer market during the COVID-19 pandemic's early months.  Beginning in

March 2020, Plaintiff Reach Companies agreed to sell hand sanitizer to Defendant

Newsert.  Defendant David Serata is Newsert's managing member.  Reach and Newsert's

relationship lasted just over a month.  Why the relationship broke down depends on who

you talk to.  Reach says Newsert backed out on commitments to purchase several million

dollars' worth of hand sanitizer, causing Reach significant damages.  Newsert says that

Reach almost always failed to deliver hand sanitizer as agreed, causing Newsert significant

damages.  In this case, Reach and Newsert each assert contract and tort claims against the

other.

Reach and Newsert have filed competing summary-judgment motions. Reach seeks summary judgment in its favor on its claims and against Newsert's counterclaims. ECF No. 49. Newsert seeks summary judgment against just Reach's claims (and not in favor of its own claims). ECF No. 40. Both motions will be denied with respect to the Parties' contract and alternative quasi-contract equitable claims. A trial is necessary to resolve fact disputes concerning the Parties' business relationship and agreements. The motions will be granted with respect to the Parties' tort claims. The record evidence cannot reasonably be construed to support any of the asserted tort claims.

*There is subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a).* Reach's sole member is Jon Tollefson, and he is a Minnesota citizen, Sec. Am. Compl. [ECF No. 24] ¶ 2, meaning Reach is too, *E3 Biofuels, LLC v. Biothane, LLC*, 781 F.3d 972, 975 (8th Cir. 2015). Newsert is a New Jersey citizen because its two members, Defendant David Serata and Richard Serata, are New Jersey citizens. Sec. Am. Compl. ¶¶ 4–6; Answer to Sec. Am. Compl. [ECF No. 26] ¶¶ 4–6. And Reach and Newsert each seek damages well above the $75,000 jurisdictional threshold.

*The basic facts.* The Parties' business relationship began in early March 2020 and ended a little more than one month later, around mid-April. *See* First Sampsel Decl., Ex. E [ECF No. 52-1 at 58–79]; Tollefson Decl., Ex. B [ECF No. 51-1 at 65–67]. At the onset of the COVID-19 pandemic, Reach—which describes itself generally as a business engaged in "product fulfillment and distribution of various goods throughout the country," Tollefson Decl. [ECF No. 51] ¶ 2—began offering to sell hand sanitizer and personal protective equipment. *Id.* In March 2020, a third-party broker called "Enchanted

Moments" alerted Newsert—a product wholesaler—that it could purchase hand sanitizer from Reach. Knoll Decl. [ECF No. 43] Ex. 1 [ECF No. 44] ("Serata Dep.") at 17–24. Enchanted Moments' Executive Vice President, Tony Davis, had a long-standing relationship with Reach. Serata Dep. at 18. Davis also had "a long-standing relationship with Serata," Defs.' Mem. in Supp. [ECF No. 42] at 3, thus the connection between Enchanted Moments and Newsert. Newsert submitted a total of 21 hand-sanitizer purchase orders to Reach through Enchanted Moments between March 6, 2020, and April 13, 2020. *See* First Sampsel Decl., Ex. E [ECF No. 52-1 at 58–79]; *see also* Tollefson Decl., Ex. B [ECF No. 51-1 at 65–67]. According to Reach: "Newsert replaced Reach with another supplier, refused to accept further delivery of Reach's goods, and then refused to pay Reach." Pl.'s Mem. in Supp. [ECF No. 50] at 2. According to Newsert: "With only one exception, Reach failed to fulfill any of Newsert's purchase orders as written." Defs.' Mem. in Opp'n [ECF No. 55] at 3. Thus, this case.

*The Parties' claims and requested relief.* Reach brought this case on May 8, 2020. ECF No. 1. In its operative Second Amended Complaint, Reach asserts claims against Newsert for breach of contract (Count One) and promissory estoppel (Count Two), as well as a claim against Newsert and Serata for tortious interference with contract (Count Three). Sec. Am. Compl. ¶¶ 51–80. Reach seeks damages "totaling approximately" $4 million, various forms of equitable relief, and attorneys' fees and costs. *Id.* at 12–13. Newsert filed its counterclaims in the same pleading as its answer to Reach's First Amended Complaint on June 1, 2020. Answer and Counterclaim [ECF No. 8]. Newsert asserts counterclaims against Reach for breach of contract (Count One), under the "U.C.C. Article 2," (Count

Two), for unjust enrichment (Count Three), conversion (Count Four), fraud (Count Five), and price gouging under N.J. Stat. § 56:8-109 (Count Six).[1]  Answer and Counterclaim ¶¶ 18–57.  In this same pleading, Newsert seeks damages greater than $75,000, various forms of equitable relief, and attorneys' fees and costs.  *Id.* at 26–27.  Newsert's Answer and Counterclaim understates its damages.  In its summary-judgment submissions, Newsert appears to describe damages worth hundreds of thousands of dollars, if not more.  *E.g.*, Defs.' Mem. in Supp. at 8–15.  Newsert did not re-assert its counterclaims in response to Reach's Second Amended Complaint; it just answered Reach's Second Amended Complaint.  *See* Defs.' Answer to Pl.'s Sec. Am. Compl. [ECF No. 26].  This procedural fact tees up the first issue.

*The better answer is that Newsert did not abandon its counterclaims by not reasserting them in response to Reach's Second Amended Complaint.*  Reach argues that summary judgment should be entered against Newsert's counterclaims because Newsert asserted its counterclaims in response to Reach's First Amended Complaint but not in response to the operative Second Amended Complaint.  Reach says this failure means Newsert abandoned its counterclaims.  Pl.'s Mem. in Supp. at 23–25 (citing Fed. R. Civ. P. 13(a)–(b), 15(a)).  In support of its position, Reach cites *Bremer Bank, N.A. v. John Hancock Life Ins. Co.*, No. 06-cv-1534 (ADM/JSM), 2009 WL 702009 (D. Minn. Mar. 13,

---

[1]  Just to confirm, Serata asserts no counterclaims.  It's just Newsert.  Serata's name appears nowhere in the counterclaims, and there is no other reason to think the counterclaims are asserted on his behalf individually.  Also, Newsert has abandoned a seventh counterclaim it asserted under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-2.  Defs.' Mem. in Opp'n at 23; *see also* Answer and Counterclaim ¶¶ 52–57.

2009).  In *Bremer Bank*, the court reasoned that there was a "sound" legal basis for finding the defendant's counterclaim to be "abandoned or no longer pending" based on the defendant's failure to replead the counterclaim in its answer to the plaintiff's second amended complaint, "together with nearly two years passing without discovery or any action on the counterclaim."  *Id.* at *12.  *Bremer Bank* relied on an Eastern District of Missouri case interpreting Rule 15 not to permit a litigant to "merely stand on preexisting pleadings made in response to an earlier complaint" and determined that Rule 13 "makes clear [that] a counterclaim is part of the responsive pleading."  *Id.* (quoting *Johnson v. Berry*, 228 F. Supp. 2d 1071, 1079 (E.D. Mo. 2002)).  *Bremer Bank* also cited a Federal Circuit case affirming a ruling from this District that a defendant's counterclaim was no longer pending after the defendant missed the deadline for filing an answer to the plaintiff's amended complaint.  *See General Mills, Inc. v. Kraft Foods Global, Inc.*, 495 F.3d 1378, 1381 (Fed. Cir. 2007).  *Bremer Bank*, *Johnson*, and *General Mills* are materially different from this case.  In *Bremer Bank*, it wasn't just that the defendant failed to reassert counterclaims in response to an amended complaint—the defendant proceeded through discovery as if the counterclaims hadn't been asserted.  In *Johnson*, the defendant filed no responsive pleading to the amended complaint and gave no indication he intended to pursue a counterclaim.  In *General Mills*, the defendant successfully moved to dismiss the amended complaint and then untimely sought to reassert its counterclaim after the entry of judgment.  We don't have anything like these facts here.  Newsert timely filed its counterclaims in response to Reach's First Amended Complaint.  ECF No. 8.  Reach replied to Newsert's counterclaims.  ECF No. 12.  Though Newsert did not reassert its

counterclaims in response to Reach's Second Amended Complaint, Newsert explicitly referenced its counterclaims in its responsive pleading.  Newsert has pursued the claims ever since it filed them.  Reach can't dispute the counterclaims were the subject of discovery: it served discovery requests referencing the counterclaims and noticed a deposition seeking information relevant only to the counterclaims.  *See* Defs.' Mem. in Opp'n at 22.  Reach has no plausible argument that it suffered prejudice in the relevant sense owing to Newsert's pleading.  Summary judgment will not be entered against Newsert's counterclaims on this procedural basis.[2]

*The familiar summary-judgment standards.*  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution "might affect the outcome of the suit" under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  Courts take a slightly modified approach where, as here, there are cross-motions for summary judgment. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).  When

---

[2]     Several federal decisions support this conclusion.  *See Ellering v. Sellstate Realty Systems Network, Inc.*, No. 10-cv-1025 (RHK/LIB), 2011 WL 13318194, at *2–4 (D. Minn. Aug. 25, 2011) (discussing cases).

considering Reach's motion,[3] the record must be viewed in the light most favorable to Defendants, and when considering Defendants' motion, the record must be viewed in the light most favorable to Reach.  *See id.*

*The Parties agree that no choice-of-law question requires resolution.*  "As this action is in federal court based on diversity of citizenship, state law governs substantive law issues."  *Paine v. Jefferson Nat'l Life Ins. Co.*, 594 F.3d 989, 992 (8th Cir. 2010) (citation omitted); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Reach says that Minnesota law governs the case, evidently based on a Minnesota choice-of-law clause in the "Terms and Conditions" sheet attached to its invoices.  Pl.'s Mem. in Opp'n [ECF No. 63] at 2; Sec. Am. Compl., Ex. A ¶ 13.  Defendants say that New Jersey law should govern the case, or at the very least Newsert's counterclaims.  Defs.' Mem. in Supp. at 17; Defs.' Mem. in Opp'n at 11 n.5.  Regardless, the Parties seem to agree (at least for purposes of these motions) that there is no material difference between the relevant common law of Minnesota and New Jersey.  Certainly no Party identifies such a difference.  For efficiency's sake then, Minnesota law will be applied to the Parties' common-law claims.  Of course, New Jersey law controls Newsert's price-gouging claim under N.J. Stat. § 56:8-109.

---

[3]      Reach's motion for summary judgment in favor of its claims lacks clarity in one (typically important) respect: it's not clear whether the motion is one for summary judgment outright or on liability only.  Reach doesn't seem to say that the motion is limited to liability, but it neither identifies the precise amount of the judgment it seeks nor argues why that amount is not the subject of genuine, material fact disputes.  *See* Pl.'s Mem. in Supp. at 19–20.

*The Parties' breach-of-contract claims are the subject of genuine, material fact disputes.*   It makes sense to analyze Reach and Newsert's breach-of-contract claims together.  They share elements and overlapping facts.  The elements of a breach-of-contract claim are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant."  *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).  Each of these elements is the subject of genuine, material fact disputes, making summary judgment in any direction inappropriate.

The Parties seem to agree that they formed contracts, but they disagree regarding the contracts' terms.[4]  Reach's position is somewhat unclear.  In its opening brief, Reach referred to its invoices as the "Agreement" and argued that the invoices "defined" its relationship with Newsert.  Pl.'s Mem. in Supp. at 4.  In its response-and-opposition brief, Reach seems to advance the position that it accepted Newsert purchase orders "indicating a ship date of 'ASAP,'" Pl.'s Mem. in Opp'n at 5, suggesting that at least those purchase orders formed or were part of the Parties' contracts.  Reach also says that, regardless of any price appearing on a Newsert purchase order, Newsert agreed to price increases prior to any shipment.  *Id.* at 9–10.  Reach cites record evidence to support its position.  For example, Reach cites deposition testimony showing that it refused to accept Newsert purchase orders with delivery dates and that Newsert agreed to accept shipments when

---

[4]      In its opening brief, Reach asserts: "There is no dispute that the parties formed an enforceable contract—to be sure, both parties have alleged a claim for breach of contract." Pl.'s Mem. in Supp. at 15–16.  This is not correct.  The mere assertion of competing contractual claims does not establish contract formation.

Reach was able to send them, that Newsert accepted shipments at prices higher than ordered initially, and that Newsert could reject shipments with unacceptably high prices. *See* Pl.'s Mem. in Supp. at 5–11; Pl.'s Mem. in Opp'n at 4, 6–8. Newsert says something different—that Reach accepted each of Newsert's 21 purchase orders "*without question, modification, or objection.*" Defs.' Mem. in Supp. at 1 (emphasis in original). Newsert denies ever agreeing to late deliveries or price increases. Newsert, like Reach, cites record evidence supporting its position. *See* Defs.' Mem. in Supp. at 5–7, 9–10. The bottom line is that (at least) the terms of the Parties' contracts are the subject of genuine fact disputes.

Of course, a genuine fact dispute may not be material, and here Newsert argues that Reach's evidence regarding the contracts' terms shows no material fact dispute because, accepted as true, Reach's evidence shows at most oral modifications to written contracts barred by the statute of frauds. In other words, Newsert says that Reach's oral-modification evidence is legally irrelevant. The law isn't that absolute. Article 2 of the Minnesota Uniform Commercial Code, Minn. Stat. § 336.2 *et seq.*, governs the sale of goods. *See* Minn. Stat. § 336.2-201. Minnesota's Uniform Commercial Code "provides that a contract for the sale of goods for the price of $500 or more is not enforceable 'unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought [or by the party's authorized agent or broker].'" *Glacial Plains Co-op v. Lindgren*, 759 N.W.2d 661, 664 (Minn. Ct. App. 2009) (quoting Minn. Stat. § 336.2–201(1)). Several rules govern the statute's application. "A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable . . . beyond the quantity of goods shown in such writing."

Minn. Stat. § 336.2-201(1); *see id.* § 336.2-204(3) ("Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."). "[A]n attempt at modification or recission . . . can operate as a waiver" even if the requirements are not satisfied. Minn. Stat. § 336.2-209(4); *see Albany Roller Mills, Inc. v. N. United Feeds and Seeds, Inc.*, 397 N.W.2d 430, 432–33 (Minn. Ct. App. 1986) (collecting cases). "[A]ny waiver under subsection 2-209(4) must satisfy the rules and principles of Minnesota law regarding waiver." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 367 (Minn. 2009). "Whether the statute of frauds applies to a contractual modification is a legal question[.]" *Estate of Werner ex rel. Werner v. Werner*, No. A14-1691, 2015 WL 4528918, at *3 (Minn. App. July 6, 2015) (citation omitted).

Though a legal question, applying these statute-of-frauds rules to this summary-judgment record yields no trustworthy answers. Reach's primary position seems to be that Newsert waived a statute-of-frauds defense. *See* Pl.'s Mem. in Opp'n at 10–11. But Reach doesn't identify record evidence connecting waiver to particular purchase orders. Newsert recognizes the issue is more nuanced in its opposition brief when it argues: "Reach has <u>zero</u> evidence that Newsert agreed to any price increases unless Reach agreed to meet delivery and other conditions that it never met." Defs.' Mem. in Opp'n at 12. In other words, Newsert seems to recognize that oral price modifications to a contract for the sale of goods are possible; it argues that didn't happen here because Reach breached other contractual terms. Deciding this argument would seem to require resolving fact questions

this record doesn't answer or, if it does, it's not clear where.[5]  The Parties' motions will be denied with respect to the contract claims.

*It would be inappropriate to enter summary judgment against the Parties' quasi-contract equitable claims.*  Newsert argues that Reach's promissory estoppel claim is not viable  because "[t]here is no genuine dispute of material fact that the written purchase orders governed Newsert's orders of hand sanitizer to Reach."  Defs.' Mem. in Supp. at 24.  As support for this assertion, Newsert relies on the well-established rule that equitable remedies are "only available where there is no contract remedy."  *Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 330 (Minn. 2004).  This same rule applies to Newsert's unjust-enrichment claim.  *GGG, Inc. v. Samuelson*, No. A20-0493, 2020 WL 7490499, at *1, *10 (Minn. Ct. App. Dec. 21, 2020).  The disposition of the Parties' summary-judgment motions as to their breach-of-contract claims leaves open whether a contract governed the parties' relationship and whether a contract remedy is available.  Accounting for the possibility that a jury might conclude no contract exists, summary judgment will not be entered against these claims.[6]

---

[5]     Newsert has cited record evidence of "just some examples of Reach's failure to honor material [shipping] terms in purchase orders that actually shipped." Defs.' Mem. in Supp. at 14.  These include hand-sanitizer bottles with missing pumps and mis-labeled shipping boxes.  *Id.* at 13–14.  Reach argues generally that "these issues amount to little more than requests and that they were not material terms to the parties' contract."  Pl.'s Mem. in Opp'n at 11.  Without knowing more—for example, to which purchase orders these deficiencies relate, the source or sources of these shipping terms, etc.—it is not possible to resolve this issue on summary judgment.

[6]     Newsert advances no other argument (beyond that Reach has a contractual claim and remedy) in support of summary judgment against Reach's promissory estoppel claim. Reach challenges Newsert's claim for unjust enrichment on its merits, contending that the

*Summary judgment is appropriate against Reach's tortious-interference-with-contract claim.* A party may recover for the tort of intentional interference with contractual relations "by establishing (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom." *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900 (Minn. 1982) (quoting *Royal Realty Co. v. Levin*, 69 N.W.2d 667, 671 (Minn. 1955)). "Even if a contract is void because it fails to meet the requirements of the Statute of Frauds, the interfering party may still be liable for inducing the breach of the contract." *Id.*

Reach claims that Newsert and Serata intentionally interfered with Reach's contractual relationships with two of its suppliers in late April 2020. Pl.'s Mem. in Supp. at 22–23. In one instance, Reach claims that Serata communicated with a bottler, Intelligent Deals, and its principal, Kyle Benus, to buy bottles that Reach says Benus already had agreed to sell to Reach. The evidence Reach identifies is an April 15, 2020 email thread between Benus, Serata, Reach's Vice President of Sales David Ehrlich, and two other individuals. First Sampsel Decl., Ex. N. In that thread, Benus offered Ehrlich 500,000 units of an 8-ounce bottle if he was interested. Ehrlich responded, "I'll probably take them! Checking now." *Id.* Serata responded to the thread later that evening stating that he had purchased Benus's production "through at least the end of May" but that if

---

same facts that establish Newsert's contractual breaches establish that Reach has not been unjustly enriched. Pl.'s Mem. in Supp. at 27. As with Reach's contract claim, many fact questions preclude the entry of summary judgment against Newsert's unjust-enrichment claim on its merits.

Reach was "interested in purchasing them or the bottles," Ehrlich could let Serata know how many he wanted, and they could "work something out." *Id*.; *see also* First Knoll Decl., Ex. 55 [ECF No. 47 at 285]. Ehrlich responded to Serata as follows:

> [Benus] agreed for me to buy the empty bottles 8 0z 500k now you're saying I can't get them?
>
> He reached out to me and offered me the deal. I made plans to get them.
>
> No[w] you're telling him to cancel the deal??

*Id*.; *see also* First Knoll Decl., Ex. 56 [ECF No. 47 at 287–89]. As a matter of law, this evidence does not show the existence of a contract between Intelligent Deals and Reach with which Serata could have interfered. It does not show that Reach actually accepted an offer to purchase the bottled from Intelligent Deals before Newsert purchased them.

The second evidence Reach identifies is an email sent by Serata to another of Reach's suppliers, DMC, explaining his issues with Reach and inquiring whether DMC was the reason Reach had not returned Newsert's money. First Sampsel Decl., Ex. L. But (again) Reach does not point to any evidence of a contract with which Serata and Newsert could have interfered by sending this email. The email seems to show only that Serata sought information from DMC as to why Reach was not fulfilling its orders as desired, and Serata received no response. *Id*.; Serata Dep. at 234–236. Because Reach has not presented trial-worthy evidence supporting the first element of its tortious-interference claim, Newsert is entitled to summary judgment.

*Summary judgment will be entered against Newsert's conversion claim.* Newsert's conversion counterclaim is premised on Reach's retention of the remainder of Newsert's

advance payments that it made electronically via wire transfer. "'The elements of common law conversion are (1) the plaintiff has a property interest and (2) the defendant deprives the plaintiff of that interest.'" *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 986 (8th Cir. 2008) (quoting *Olson v. Moorhead Country Club*, 568 N.W.2d 871, 872 (Minn. Ct. App. 1997) (internal quotation omitted)); *see DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997) (defining conversion "as an act of willful interference with personal property, 'done without lawful justification by which any person entitled thereto is deprived of use and possession'" (quoting *Larson v. Archer–Daniels–Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948))). The Minnesota Court of Appeals has held that "a conversion claim is viable with respect to money only if the money is in a tangible form (such as a particular roll of coins or a particular stack of bills) and is kept separate from other money." *TCI Bus. Cap., Inc. v. Five Star Am. Die Casting, LLC*, 890 N.W.2d 423, 428–29 (Minn. Ct. App. 2017); *see Streambend Props. II, LLC v. Ivy Tower Minneapolis LLC*, No. A18-1488, 2019 WL 2332409, at *8 (Minn. Ct. App. June 3, 2019). The court in *TCI* reached this conclusion for three reasons: (1) the Minnesota Supreme Court has typically defined property as goods and all of its prior opinions regarding conversion concerned tangible personal property; (2) that holding was consistent with the Minnesota Court of Appeals' only precedential opinion to address the issue expressly; and (3) the holding also was "consistent with the traditional common-law rule that an electronic financial transaction cannot be the basis of a conversion claim." 890 N.W. 2d at 428–29. This holding jibes with the Eighth Circuit's long-held understanding that Minnesota conversion law follows "the general rule . . . that the cause of action only applies to tangible property,

14

or intangible property customarily merged in, or identified with, some document." *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1547 (8th Cir. 1989) (citations omitted); *see Advanced Ctrl. Tech., Inc. v. Iversen*, No. 19-cv-1608 (DSD/TNL), 2021 WL 2646858, at *5 (D. Minn. Apr. 8, 2021) (same). New Jersey law seems to apply the same (or perhaps a very similar) rule. *See Advanced Enter. Recycling, Inc. v. Bercaw*, 869 A.2d 468, 472–73 (N.J. Super. Ct. App. Div. 2005) ("An action for conversion will not lie in the context of a mere debt or chose in action, however. Where there is no obligation to return the identical money, but only a relationship of a debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor."); *Read v. Profeta*, 397 F. Supp. 3d 597, 640–41, n.30 (D.N.J. 2019). These rules are dispositive here because Newsert does not allege that Reach converted either money in tangible form or segregated or specifically identifiable funds. In other words, the subject of Newsert's conversion claim—funds it wired to Reach—are not "property" to which the cause of action applies.

In support of its position, Newsert cites *De Castro v. Castro*, No. 18-cv-1449 (DWF/ECW), 2018 WL 6026089, at *5–6 (D. Minn. Nov. 16, 2018). It is true that *De Castro* did not follow *TCI*. *De Castro* concluded that *TCI*'s discussion of the scope of a conversion claim was *obiter dictum*, noted that the Minnesota Court of Appeals had on at least one prior occasion (in an unpublished opinion) recognized a conversion claim based on electronic money transfers, and noted that other decisions from this District had concluded that intangible funds were susceptible to conversion. *De Castro*, 2018 WL 6026089, at *5–6 (citing *Cummins Law Office, P.A. v. Norman Graphic Printing Co.*, 826

F. Supp. 2d 1127, 1133 (D. Minn. 2011)).  Better to accept *TCI* as "the best evidence of what the state law is" and well-reasoned, persuasive authority that should be followed. *Continental Cas. Co. v. Advance Terrazzo & Tile Co.*, 462 F.3d 1002, 1007 (8th Cir. 2006). The cases from this District and the Minnesota Court of Appeals on which *De Castro* relied were decided prior to *TCI*.  Other decisions from this District have applied *TCI*'s rule that a conversion claim cannot proceed when it concerns money in an intangible form.  *E.g.*, *Hajiabdi v. Metro. Transp. Network, Inc.*, No. 21-cv-268 (ECT/ECW), 2021 WL 3885653, at *4 (D. Minn. Aug. 31, 2021); *World Bus. Lenders, LLC v. Palen*, No. 16-CV-329 (PAM/KMM), 2017 WL 2560918, at *6 (D. Minn. June 13, 2017).  And the rule "serves sensible and practical interests, as this case demonstrates:" Newsert wants its money back, but nothing in the record suggests it cares precisely where Reach gets that money.  *Metro. Transp. Network, Inc.*, 2021 WL 3885653, at *4.[7]

   *Newsert's future-promises-based fraud claim is not trial-worthy.*  Newsert's fraud claim has four elements: "(1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce action in reliance thereon; (4) that the representation caused action in reliance thereon; and

---

[7]     Minnesota's independent-duty rule has not been addressed as part of the summary-judgment motions.  Under this rule, "when a plaintiff seeks to recover damages for an alleged breach of contract he is limited to damages flowing only from such breach except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort."  *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 896 N.W.2d 115, 125–26 (Minn. Ct. App. 2017) (citation omitted); *Klucas v. M.H. Graff & Assocs.*, No. 20-cv-762 (SRN/TNL), 2020 WL 6275971, at *3 (D. Minn. Oct. 26, 2020). On the present record, the rule would seem to pose a barrier to any conversion claim.

(5) pecuniary damages as a result of the reliance." *U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011).  Newsert's fraud claim is premised on future promises, specifically its assertions that "with the acceptance of each and every purchase order, Reach knowingly misrepresented its ability or intention to timely deliver goods, to deliver goods at prices set forth in purchase orders, and to deliver goods that complied with basic labeling, packaging and other requirements," and that Reach "persisted in knowingly making false promises in order to induce Newsert to continue making prepayments and otherwise to continue doing business with Reach."  Answer and Counterclaim ¶¶ 39–44. A future promise is generally non-actionable in fraud. *Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 368–69 (Minn. 2009).  "It is true that a misrepresentation of a present intention c[an] amount to fraud," but it "must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made." *Id.* at 369 (citation omitted).  "A subsequent intention to break [a] promise or failure to fulfill it does not constitute fraud." *Benson v. Rostad*, 384 N.W.2d 190, 195 (Minn. Ct. App. 1986) (citing *Wojtkowski v. Peterson*, 47 N.W.2d 455, 458 (Minn. 1951)) (explaining that even if the jury found that the defendant made promises to plaintiff about scheduling, "some showing that he did not intend to fulfill the promise when he made it" was required). Allegations that a defendant did not fulfill a promise alone do not suffice. *Munro v. Lucy Activewear, Inc.*, 899 F.3d 585, at 590–91 (8th Cir. 2018); *Stumm v. BAC Home Loans Serv., LP*, 914 F. Supp. 2d 1009, 1014 (D. Minn. 2012).

Reach argues that it is entitled to summary judgment on Newsert's fraud claim because "[t]here is no affirmative evidence within the record that Reach did not intend to

keep its promises at the time [they were] made, or that it made a knowingly false statement of material fact."  Pl.'s Mem. in Supp. at 29.  Newsert points to Ehrlich's deposition testimony and various email and text message communications between representatives of Reach, Newsert, and Enchanted Moments as evidence of fraud that would defeat summary judgment.  Defs.' Mem. in Opp'n at 7–8, 19 (citing Ehrlich Dep. [ECF No. 57] at 27–36, 57, 64, 131, 143–144, 206–219, 240–248, 289–302; First Knoll Decl., Exs. 30, 34–36, 46; Second Knoll Decl., Exs. 61–62).  These communications reflect that Reach's prices and shipping dates for Newsert's orders were moving targets.  But the mere facts that prices and shipping dates changed over time and that initial promises ultimately were unfulfilled do not show fraud.  Much of the cited testimony pertains to Ehrlich's representations as to what Reach was charging other customers, but that does not materially bear on whether Reach intended to fulfill promises it made to Newsert.  Ehrlich also testified that the information he communicated in his role as a sales representative was information he received from others at Reach and that "[t]o the best of [his] knowledge" he "was giving information he absolutely thought was true and correct[.]"  *E.g.*, Ehrlich Dep. at 143, 210–211, 217, 291.  Ehrlich further testified that Reach informed Newsert from the beginning that it could not guarantee prices and shipping dates given the fluctuating circumstances of the pandemic.  *See id.* at 31, 32.  The closest this evidence comes to creating a genuine issue as to whether Reach lacked the intention to perform when it promised to do so is Ehrlich's testimony regarding Reach's practice of sorting purchase orders into two piles: a first priority pile for those customers with no special requirements and no cancel date and a second priority pile for those with a cancel date.  *Id.* at 28, 29.  Ehrlich testified that Reach

made purchase orders with a cancel date a second priority because it "knew that there [we]re going to be times where [it] [could] come through for the client or not come through for the client based on unforeseen circumstances." *Id.* at 36.  But there is no dispute that Newsert's purchase orders did not have cancel dates and were put in the first priority pile. *See id.* at 32.  The record shows that Newsert may have received conflicting information from Tollefson and Ehrlich, but inconsistency in these communications does not reasonably permit an inference of fraud.  *See id.* at 241–244, 302.  Summary judgment will be entered against Newsert's fraud claim.

*Newsert lacks statutory standing to assert a claim under New Jersey's Consumer Fraud Act.*  Section 56:8-109 of New Jersey's Consumer Fraud Act, N.J. Stat. § 56:8-1, *et seq.*, makes it:

> an unlawful practice for any person to sell or offer to sell within 30 days after the declaration of a state of emergency, or for such other period of time as the Governor may specify in the declaration of a state of emergency, in the area for which the state of emergency has been declared, any merchandise which is consumed or used as a direct result of an emergency or which is consumed or used to preserve, protect, or sustain the life, health, safety or comfort of persons or their property for a price that constitutes an excessive price increase.  The Governor may by executive order extend the period during which this prohibition remains in force.

*Id.* § 56:8-109.  An excessive price increase generally means "a price that is excessive as compared to the price at which the consumer good or service was sold or offered for sale by the seller in the usual course of business immediately prior to the state of emergency." *Id.* § 56:8-108.  The Act identifies specific circumstances where a price will be deemed excessive.  *Id.*  The Act also provides a private right of action as follows:

> Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . may bring an action . . . therefor in any court of competent jurisdiction.  In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest.  In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.

N.J. Stat. § 56:8-19.  The Act defines "person" to include "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof."  N.J. Stat. § 56:8-1.  Although "the clear statutory objective is to protect consumers, neither the term 'consumer' nor 'consumer transaction' is found within the statute's definitional provisions."  *Papergraphics Int'l, Inc. v. Correa*, 910 A.2d 625, 628 (N.J. Super. Ct. App. Div. 2006); *see Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 460–61 (N.J. 1994) (describing the Act's legislative history).

Regardless, New Jersey courts have made clear that the Act "does not cover every sale in the marketplace," but rather only consumer transactions fall within "the ambit of CFA protection."  *Papergraphics*, 910 A.2d at 628–29.  The Act's protections may, however, "extend[] to corporate plaintiffs in a consumer oriented situation."  *Id.* at 628 (cleaned up).  The applicability of the Act "hinges on the nature of a transaction, requiring a case by case analysis."  *Id.* at 628.  A number of New Jersey courts have "determined that a wholesale buyer of goods intended for resale is not a 'consumer,' and the sale is a non-consumer transaction" unprotected by the Act.  *Id.* at 629 (collecting cases).  In

*Papergraphics*, the court held that "although [the] plaintiff purchased a common consumer product," printer ink cartridges, it was not a consumer within the meaning of the Act.  *Id.*  In particular, the quantity of goods purchased together with the purpose of the purchase (9,714 cartridges purchased for resale at a significant profit) showed the transaction was not covered by the Act.  *Id.*  The court also emphasized that the parties were "experienced commercial entities of relatively equal bargaining power which engaged in negotiated contracts" and that the plaintiff "was not an unsophisticated buyer, suffering a disparity of industry knowledge."  *Id.*

The record shows beyond any genuine material dispute that this is what we have here—*i.e.*, commercial organizations of non-disparate bargaining power engaged in supplier-wholesaler (not consumer) transactions.  Although the court in *Papergraphics* interpreted a different section of the Act, § 56:8-2, that section, like § 56:8-109, uses the term "person," not "consumer."  Newsert intended to purchase large amounts of hand sanitizer for resale at a profit, not for its personal use.  Newsert identifies no record evidence showing that it acted as a consumer in any respect in its dealings with Reach.  Reach and Newsert are experienced, sophisticated commercial entities that engaged in negotiations, and there is no suggestion that either occupied a superior, unequal bargaining position.  Under these circumstances, the entry of summary judgment against Newsert's price-gouging claim under N.J. Stat. § 56:8-109 is appropriate.[8]

---

[8]    Though Reach argued that it is entitled to summary judgment with respect to this counterclaim on the basis of statutory standing, Pl.'s Mem. in Supp. at 30, Newsert did not address this question, Defs.' Mem. in Opp'n at 20.  It argued only that Reach violated the Act.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Defendants' Motion for Summary Judgment [ECF No. 40] is **GRANTED in part and DENIED in part** as follows:

      a.      Defendants' motion is **GRANTED** with respect to Plaintiff's claim for tortious interference with a contract (Count Three).

      b.      Defendants' motion is **DENIED** in all other respects.

2.      Plaintiff's Motion for Summary Judgment [ECF No. 49] is **GRANTED in part and DENIED in part** as follows:

      a.      Plaintiff's motion is **GRANTED** with respect to Newsert's counterclaims for conversion (Count Four), fraud (Count Five), and price gouging under N.J. Stat. § 56:8-109 (Count Six).

      b.      Plaintiff's motion is **DENIED** in all other respects.

Dated: November 29, 2021                s/ Eric C. Tostrud
                                         Eric C. Tostrud
                                         United States District Court